FARMER, EXECUTOR v. BARNES.

4-9668                              246 S. W. 2d 563

Opinion delivered March 3, 1952.

*John L. Sullivan,* for appellant.

*Byron Bogard,* for appellee.

*Henry E. Spitzberg, amicus curiae*

Griffin Smith, Chief Justice. J. L. Bowden, 75 years of age, sued Virgie Barnes, 57, to cancel the deed to property Bowden admittedly paid for, but had the title placed in Mrs. Barnes' name under an agreement, as the purchaser contended, that the grantee was to take care of him. Bowden died Oct. 15, 1951, and Farmer was appointed executor.[1]

Bowden married Mrs. Barnes' mother when Virgie was nine years of age. Until about eighteen months before trial of the cause resulting in this appeal Bowden had resided at Tuckerman, in Jackson county. Mrs. Barnes lived with her husband in North Little Rock. Because of ill health, and being a widower, Bowden found it inconvenient to live alone at Tuckerman. From time to time he visited the Barnes family, remaining five weeks on one occasion and seven on another. It is appellee's contention that her stepfather accepted her invitation and that of her husband to move to North Little Rock and reside with them. In so doing it became necessary for Bowden to sell his Tuckerman home and other property. Neither the amount realized from these sales, nor the sum of money Bowden may have had on hand independently of the sales is shown.

When Bowden joined his stepdaughter pursuant to the invitation referred to, Mr. and Mrs. Barnes were living in a home Bowden disliked because of its size,

---

[1] Farmer's appointment as executor, instead of administrator, suggests the existence of a will, although none is mentioned in this appeal.

location, and the existence of sand fleas and mosquitoes. The new place agreed upon is No. 2314 Park Avenue, Little Rock. The consideration was $6,850. A representative of the realty company through which Bowden dealt testified that from conversations he had with Bowden in Mrs. Barnes' presence the understanding was that Bowden would buy the property so he could have a place to live where Mrs. Barnes could "take care of him." There was no detailed discussion regarding the scope of this arrangement.

Bowden testified that Mr. and Mrs. Barnes had repeatedly asked him to live with them in North Little Rock. Bowden had undergone an operation while living at Tuckerman. The substance of his testimony is that Virgie had promised to take care of him and that he moved in response to her suggestion, relying completely on Virgie's invitation to become a member of the family and, inferentially, to be taken care of in all respects as though he were their personal charge.

In explaining the nature of his illness Bowden testified that his physician had prescribed a liquid or "soft" diet. He could not swallow solids because "my trouble is right here"— The area of physical difficulty was pointed to, but the record merely reads, "indicating."

A great deal of Bowden's testimony goes to minor transactions, but if accepted at full value his presence in the newly-acquired home was barely tolerated. A physical encounter occurred as the result of an argument over a dog. It is difficult to get a clear picture of the affair. Bowden admitted having drawn a pocket knife, but claims it was not opened. Mrs. Barnes thought it was. In describing the affray Bowden testified that when he took the unopened knife from his pocket Mrs. Barnes grabbed him from behind, pulling him from a table, and "they began on me."

Irrespective of a determination of responsibility for this engagement—explained upon an entirely different theory by Mrs. Barnes—the fact is inescapable that relationships had become strained, although Bowden continued to remain with the family. He needed malt to go

with a milk diet and claimed that it was necessary to buy this personally. Hospitalization cost $720.92.

In response to a question by the court Bowden said his understanding of the arrangement under which he went to live with Mr. and Mrs. Barnes was that "they were to take care of me [and] in return for [these services] Mrs. Barnes was to have the place when I died."

Bowden complained that the telephone was moved from the dining room into Mrs. Barnes' bedroom, so he could not get to it—a necessity in ordering medicine. On at least one occasion he was compelled to go to a neighbor's house to telephone the drugstore. He complained that Mrs. Barnes was gone much of the time, but after suit was filed she procured the services of a woman attendant who looked after him. He had been ordered off the place by Barnes and his wife.

Bowden conceded that when the fight occurred Mrs. Barnes told her husband not to use an old mop as a weapon, but he also insisted that Mrs. Barnes punched him with a knife and twisted his arms until they were black. Blood, said the witness, was running off his hand in a stream "where she had stuck that knife in me—just jabbed me with it." On cross-examination Bowden insisted that Mrs. Barnes cut him with a small paring knife—"the kind they peel potatoes and peaches with." He admitted, however, that Mrs. Barnes took his knife from him. Bowden had known his stepdaughter's husband for fifty years and they had always been on friendly terms.

When Bowden was leaving St. Vincent's Infirmary Mrs. Barnes went with him to the business office, where he paid the bill. Mrs. Barnes paid her own bill, but did not offer to pay his. In a general way Bowden thought the estrangement began when he refused to turn over to Mrs. Barnes some other funds he had—the amount being no more than he thought would be necessary as a cash reserve.

The court asked Bowden whether Mrs. Barnes required him to pay his own laundry bills [for shirts] and

he replied, ''Why, yes! The bill would come to her and so she would come in and ask me for it—hand it to me and say [the amount] was so-and-so.'' This testimony was not denied.

Mrs. Barnes' version of the arrangement was that her stepfather just told her and her husband that he was coming to Little Rock to live with them. When asked why Bowden bought the place and put the title in her she replied in effect that it was because they needed a larger house, ''but he did not say my husband and I were to take care of him.'' Question: ''Did you have any arrangement with him?'' A. ''No, not for that. I thought taking care of him was taking care of him when he was sick—waiting on him, that way. I didn't know he wanted us to pay his doctors' bills.''

Question by the Court: ''If he doesn't have any money would you pay the doctors' bills? You realize you have to give something for a $6,800 house in addition to just giving him bed and board! If he needs medical aid don't you think you have to give it to him?'' A. ''I guess so.''

The witness then admitted that animosity existed between them, but she didn't think she had mistreated him. Mrs. Barnes denied having a paring knife at the time the so-called fight occurred. She thought Bowden cut his hand during the scuffle.

Mrs. Barnes thought Bowden had some money other than that invested in the Little Rock home, and in addition he was collecting $50 in monthly payments on the Tuckerman house. The malt, said Mrs. Barnes, was a prescription, therefore she did not pay for it, but she had paid one bill for medicine. In respect of the realtor's testimony regarding what the conversations were when the property was purchased, Mrs. Barnes admitted that the salesman's version was correct; but, said she, ''[Bowden] was the one that made it.'' She ''guessed'' this was correct. Seemingly Mrs. Barnes was undertaking to tell the court that she did not affirmatively assent when her stepfather mentioned the plan that included support. When asked again whether she was willing to buy the

malt drink required by Bowden at each meal Mrs. Barnes replied that it was a prescription, but she would pay for it.

The clear implication attaching to Mrs. Barnes' testimony, when considered with Bowden's, is that an accord was not reached regarding the conveyance. It is hardly believable that a 75-year-old man, broken in health and with full knowledge of his impaired physical condition, would invest for the benefit of another the remnant of a life's saving without reserving the accommodations mentioned in Bowden's testimony and to some extent verified by the realtor.

One cannot read the record without concluding that the trial court had considerable doubt (1) whether there had been a meeting of the minds of the associating parties, and (2) whether Mrs. Barnes and her husband were in good faith endeavoring to discharge the duties Mrs. Barnes now concedes she should have performed. Conditions were substantially better after Bowden filed his suit, but we do not think that the evidence establishes sufficient good faith on Mrs. Barnes' part to entitle her to retain the property. She claims to have paid funeral expenses, and perhaps there are other items that should be allowed, in addition to board from the time Bowden moved into the family circle. This should be computed by Probate Court upon a fair basis without taking rental value of the house into account. Mrs. Barnes and her husband should not be charged with rent during Bowden's tenure; neither should they be charged with this item prior to the date of this opinion. The North Little Rock home in which they lived was surrendered at Bowden's suggestion, and it would be an assumption to say that Bowden would have wished to penalize his stepdaughter with the burden incident to accountability for rent.

Reversed with directions to cancel the deed.

Mr. Justice WARD not participating.